IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

INTERNATIONAL UNION, UNITED
MINE WORKERS OF AMERICA, *et al.*,

    Plaintiffs,

v.                                    CIVIL ACTION NO. 1:16-cv-12506

CONSOL ENERGY, INC., *et al.*,

    Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the court are defendant CONSOL Energy, Inc.'s motion to dismiss the Second Amended Complaint, (ECF No. 79); defendants Amonate Facility, LLC, Helvetia Coal Company, Island Creek Coal Company, and Laurel Run Mining Company's (collectively "the Subsidiaries") motion to dismiss the Second Amended Complaint, (ECF No. 98); and the United Mine Workers of America and six individual retirees' (collectively "plaintiffs") motion to consolidate cases.  (ECF No. 97.)  Also pending is the Subsidiaries' second motion to dismiss Count II of the Second Amended Complaint and to transfer Count I.  (ECF No. 111.)

For the following reasons, CONSOL Energy, Inc.'s motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, the Subsidiaries' first motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, the Subsidiaries' second motion to dismiss Count II is **GRANTED**,

plaintiffs' motion to consolidate is **GRANTED**, and the
Subsidiaries' motion to transfer Count I is **GRANTED**.

## I.   <u>Factual and Procedural Background</u>

Defendant CONSOL Energy, Inc. ("CONSOL") is a publicly
owned energy company engaged in the operation of mines and
facilities related to the production of coal, which it sells
worldwide to electricity generators and steelmakers.  CONSOL
maintains its corporate headquarters near Pittsburgh,
Pennsylvania.  Plaintiff International Union, United Mine
Workers of America ("UMWA") is a labor organization that
represents coal miners.  The UMWA maintains its principal place
of business in Triangle, Virginia, and has offices within the
Southern District of West Virginia ("SDWVa") at Beckley,
Charleston, and Chapmanville.  The six individual retirees
("Retiree-Plaintiffs") are residents of the SDWVa, and are
retired coal miners and participants in and beneficiaries of the
group health insurance plan at issue in this case.

The UMWA periodically negotiates labor agreements, called
National Bituminous Coal Wage Agreements ("NBCWA"), with the
Bituminous Coal Operators' Association ("BCOA"), a multi-
employer bargaining group which acts on behalf of member
employers.  In 2011, the BCOA and the UMWA agreed to a new
NBCWA, which governed the terms and conditions of employment of

UMWA-represented miners employed by CONSOL and its subsidiaries. (ECF No. 78, ¶ 17.)  CONSOL's CEO Nicholas J. DeIuliis led the BCOA Negotiating Committee in 2011, and he personally signed for the BCOA in portions of the 2011 NBCWA.  (Id. ¶ 23.)

The Subsidiaries in this action were among the signatory companies to the 2011 NBCWA.  (Id. ¶ 22.)  The Subsidiaries were also signatories to the Employer Plan, an employee welfare benefit plan governed by ERISA,[1] and CONSOL acted as Plan Administrator of the Employer Plan.  Each signatory to the 2011 NBCWA is required to establish an Employer Plan, which is then incorporated into the 2011 NBCWA.  (Id. ¶ 17.)

On October 31, 2016, the Subsidiaries informed the UMWA of their intent to terminate the 2011 NBCWA when it expired on December 31, 2016.  (Id. ¶ 31.)  The Subsidiaries met with the UMWA on multiple occasions in 2016 to negotiate changes to the Employer Plan to be implemented following the 2011 NBCWA's expiration.  (Id. ¶¶ 28-33.)  CONSOL also sent five pieces of correspondence directly to retirees relating to these proposed changes:  one dated March 15, 2016; one dated May 6, 2016; two dated January 3, 2017; and one dated January 12, 2017 (collectively "Retiree Letters").  (See id. ¶¶ 26, 39-41.)  In

---

[1] The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

those communications, CONSOL stated that it planned to exit the coal industry and intended to terminate the defined health benefits provided through group insurance under the Plan.[2]  (Id.)

### A. Initiation of the ROD Arbitration

The UMWA rejected certain proposed changes to the Employer Plan, which led the UMWA to invoke the resolution of dispute ("ROD") mechanism of the Employer Plan on November 10, 2016. The 2011 NBCWA contained a dispute resolution provision specifying that the Trustees of the UMWA Health and Retirement Funds ("Trustees") will resolve any disputes as to application of the Employer Plan provisions under the 2011 NBCWA.  (ECF No. 8, Ex. 8 at p.76.)  The ROD form, No. 11-0143, was filed by a UMWA official and named one individual miner receiving benefits under the Employer Plan.  However, the UMWA indicated in that form that the dispute covered all beneficiaries of the Employer Plan.  The ROD filing specifically requested an order from the Trustees that "CONSOL must notify its retirees that it cannot make any changes in their benefits without the agreement of the UMWA."  (Id., Ex. 21.)  On December 22, 2016, the UMWA

---

[2] CONSOL purported in one communication to beneficiaries, sent January 12, 2017, to have modified the terms of the Employer Plan to eliminate the Resolution of Dispute arbitration mechanism and require any all disputes to be brought in the Western District of Pennsylvania.  (ECF No. 8, Ex. 32.)

4

transmitted a letter to CONSOL asking that it take no further action pending a decision by the Trustees on the ROD filing. (Id., Ex. 28.)

### B. Procedural Beginnings of the Instant Suit

On December 23, 2016, the UMWA and the Retiree-Plaintiffs together filed a Complaint in this court against CONSOL, seeking a preliminary injunction in aid of labor arbitration. (ECF No. 1.) CONSOL filed a motion to dismiss the Complaint on January 20, 2017, claiming that this court lacked subject matter jurisdiction because it was the Subsidiaries, and not CONSOL, who were parties to the 2011 NBCWA and the Employer Plan at issue. (ECF No. 13.) CONSOL made no arguments regarding personal jurisdiction in this motion to dismiss. (See ECF No. 14.)

On January 24, 2017, plaintiffs amended the Complaint to join the Subsidiaries as co-defendants. (ECF No. 16.) This First Amended Complaint did not allege a violation of ERISA nor did it seek to compel any defendant to arbitrate under the LMRA.[3] Rather, like the initial Complaint, it sought injunctive relief preventing "(1) any unilateral action by Defendants to terminate and/or replace the Employer Plan; and (2) any further

---

[3] The Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185.

communication from Defendants to participants and beneficiaries of the Employer Plan informing them of any changes to the Employer Plan," until the Trustees had issued a final and binding decision on the ROD filing.  (ECF No. 16, at 21.)

After briefing and a hearing, this court issued an interlocutory order and memorandum opinion on the merits of plaintiffs' First Amendment Complaint on March 17, 2017.  Int'l Union, UMWA v. Consol Energy, Inc., 243 F. Supp. 3d 755 (S.D.W. Va. 2017), *appeal mooted*, No. 17-1378 (4th Cir. Nov. 27, 2017). The court concluded the ROD grievance was arbitrable by the Trustees and granted a preliminary injunction against CONSOL (and its agents and assigns), but dismissed the Subsidiaries for lack of personal jurisdiction.  See id.

### C. The ROD Decision and the Second Amended Complaint

On October 31, 2017, the Trustees issued their decision in favor of the UMWA, concluding that CONSOL is not permitted to make modifications or changes to the retiree health benefit plan unilaterally, and that the proposed changes described will not provide the level of health benefits as mandated in the 2011 NBCWA or Employer Plan.  (See ECF No. 78-1.)

That same day, plaintiffs moved for leave to amend their complaint to rejoin the Subsidiaries as co-defendants, and to add two new causes of action:  1) a LMRA claim to confirm ROD

No. 11-0143 under LMRA § 301; and 2) an ERISA claim seeking a declaration by this court that defendants may not change the Employer Plan benefits without agreement from the UMWA.  (ECF No. 67.)  This court granted plaintiffs' motion to amend the complaint on May 21, 2018, see Int'l Union, UMWA v. CONSOL Energy, Inc., 2018 WL 2328028 (S.D.W. Va. May 21, 2018), and plaintiffs filed the Second Amended Complaint ("SAC") on May 23, 2018.  (ECF No. 78.)

### D. The First WDPa Suit

On January 2, 2017, the Subsidiaries commenced an action in the Western District of Pennsylvania ("WDPa").  See Helvetia Coal Co. v. UMWA, No. 17-00002 (W.D. Pa. filed Jan. 2, 2017) (hereinafter "First WDPa Suit").  The Subsidiaries sought:  (1) a declaration that ROD No. 11-0143 is not arbitrable and an order enjoining its arbitration; (2) a declaration that the ROD process is not applicable to retiree health benefits disputes that arise after the 2011 NBCWA expired on December 31, 2016, and an order enjoining arbitration of ROD No. 11-0143; and (3) a declaration that the proposed changes do not breach the requirements of the Employer Plan.  See id., at ECF No. 1.

7

Basing its decision on the first-to-file rule,[4] the WDPa court ordered that this First WDPa Suit be transferred to this court. Helvetia Coal Co. et al v. UMWA, 2017 WL 3669415 at *4 (W.D. Pa. Aug. 23, 2017).  After the First WDPa Suit was transferred and docketed in this court as No. 1:17-cv-03876, the Subsidiaries voluntarily dismissed the action.  See First WDPa Suit, No. 1:17-cv-03876 (S.D.W. Va. filed Jan. 2, 2017), ECF No. 42.

     **E. The Second WDPa Suit**

     On October 31, 2017 – the same day as the Trustees' ROD decision – the Subsidiaries filed a second action in the WDPa. See Helvetia Coal Co. v. UMWA, No. 17-01417 (W.D. Pa. filed Oct. 31, 2017) (hereinafter "Second WDPa Suit").  The Subsidiaries requested that the court:  "(1) vacate the October 31, 2017 decision in ROD No. 11-0143; (2) declare that the negotiated exhaustion of remedies requirement and Resolution of Disputes process provided in the relevant section of the expired 2011 NBCWA, and 2011 employee benefit plan, is inapplicable to post-termination retiree health benefit disputes; (3) declare that [the Subsidiaries] do not breach the expired 2011 NBCWA by changing the mechanism for providing healthcare benefits for

---

[4] Plaintiffs filed the instant case in this court on December 23, 2016, prior to the Subsidiaries' January 2, 2017 filing of their action in the WDPa.

8

their Medicare-eligible retirees and dependents from an employer-sponsored group insurance to individually directed Health Reimbursement Accounts; and (4) declare that negotiations between the Union and [the Subsidiaries] concerning post-termination changes to the Plan are subject to the NLRA, and its impasse doctrine." Helvetia Coal Co. v. UMWA, 2018 WL 3122378, at *2 (W.D. Pa. June 26, 2018).

The WDPa district court again found that the first-filed rule dictated the action be transferred to the SDWVa, and transferred this second action to this court on June 26, 2018. Id. at *6. The case was docketed in this district as 1:18-cv-01095, and is currently pending before this court. See Second WDPa Suit, No. 1:18-cv-01095 (S.D.W. Va. filed Oct. 31, 2017).

On February 28, 2020, the Subsidiaries filed a motion to transfer back to the WDPa. Id., ECF No. 46. The Subsidiaries note that their motion to transfer is pled in the alternative to the motions filed in the instant case, and they do not waive their motions and jurisdictional challenges made in this action. See id., ECF Nos. 47, 52.

### F. The Instant Motions at Issue

#### i. Defendants' motions to dismiss

CONSOL filed its motion to dismiss the SAC on May 23, 2018. (ECF No. 79.) In its motion, CONSOL makes several arguments as

to why both Count I (the LMRA § 301 claim seeking to enforce the Trustees' ROD decision) and Count II (the ERISA § 502(a)(3) claim seeking declaratory relief) must be dismissed.  (ECF No. 80.)  Plaintiffs responded on June 18, 2018, (ECF No. 86), and CONSOL filed its reply on June 25, 2018.  (ECF No. 90.)

The Subsidiaries filed their first motion to dismiss the SAC on July 13, 2018.  (ECF No. 99.)  Plaintiffs responded on July 25, 2018, (ECF No. 101), and the Subsidiaries filed their reply on August 1, 2018.  (ECF No. 102.)  Several of the arguments made in the Subsidiaries' motion and responses raise identical issues as CONSOL's motion to dismiss.[5]  Additionally, some of the arguments by both the Subsidiaries and plaintiffs are repeated in the briefing of the Subsidiaries' second motion to dismiss,[6] filed on February 28, 2020.  (ECF No. 112.)  Where

---

[5] These issues include the Retiree-Plaintiffs lack of standing for the LMRA claim; the UMWA's lack of standing to prosecute the ERISA claim; improper venue for both claims; the Retiree-Plaintiffs failure to exhaust administrative remedies; and the failure to state a valid claim under ERISA § 502(a)(3).

The court also notes that all plaintiffs are represented by the same counsel, and all defendants are represented by the same counsel.  Thus, it is no surprise that many of the arguments made are very similar.

[6] Plaintiffs filed their response to the Subsidiaries' second motion to dismiss on April 3, 2020, (ECF No. 115), and the Subsidiaries filed their reply on April 20, 2020.  (ECF No. 118.)

the court later summarizes the parties' arguments made in the various motions, the court has taken note of arguments made by both CONSOL and the Subsidiaries on the shared issues and lines of argument, and may merge the arguments as being made by "defendants" where applicable.  This allows the court to discuss the issues raised while avoiding repetition in its summaries.

### ii. Plaintiffs' motion to consolidate

On July 10, 2018, plaintiffs filed a motion to consolidate this case with the Second WDPa Suit after it was transferred to this court.  (ECF No. 97.)  Defendants jointly filed a motion opposing consolidation on July 24, 2018.  (ECF No. 100.)

### iii. Subsidiaries' motion to transfer

In their second motion to dismiss, the Subsidiaries also moved that this court transfer this case to either the WDPa or the District of Columbia.  (See ECF No. 112.)  Plaintiffs filed their response to this motion on April 3, 2020, (ECF No. 115), and the Subsidiaries filed their reply on April 20, 2020.  (ECF No. 118.)  The Subsidiaries also filed a motion to transfer in the Second WDPa Suit after it was transferred to this court. See Second WDPa Suit, No. 1:18-cv-01095 (S.D.W. Va. filed Oct. 31, 2017), ECF No. 46.  The briefing on that motion included largely identical arguments to those made in the motion to transfer briefing in this case.

11

## II.  **Analysis**

This case is complex.  There are two plaintiffs (the UMWA and the Retiree-Plaintiffs) suing two defendants (CONSOL and the Subsidiaries) on two causes of action (an LMRA § 301 claim and an ERISA § 502(a)(3) claim).  Thus, there are essentially eight total claims made by plaintiffs before the court:  1) an LMRA claim by the UMWA against CONSOL; 2) an LMRA claim by the UMWA against the Subsidiaries; 3) an LMRA claim by the Retiree-Plaintiffs against CONSOL; 4) an LMRA claim by the Retiree-Plaintiffs against the Subsidiaries; 5) an ERISA claim by the UMWA against CONSOL; 6) an ERISA claim by the UMWA against the Subsidiaries; 7) an ERISA claim by the Retiree-Plaintiffs against CONSOL; and 8) an ERISA claim by the Retiree-Plaintiffs against the Subsidiaries.  There are also many motions pending by all parties, and the grounds for the motions involve procedural, jurisdictional, as well as substantive issues.  Moreover, the court finds that many of the rulings on issues involving one claim affect the way the court must or should rule on another claim.

The court therefore believes the best way to carefully and clearly address all the outstanding issues in this case is to address each issue individually, summarizing the parties'

positions and arguments made in the extensive briefing and then discussing the court's findings and conclusions.

### A. Venue and Personal Jurisdiction Over CONSOL

CONSOL argues that both Counts I and II must be dismissed for improper venue and lack of personal jurisdiction.  CONSOL claims that the appropriate venue lies in the WDPa, and that by the May 23, 2018 filing of the SAC, its contacts with West Virginia had become so attenuated that the court lacks personal jurisdiction over it.  Plaintiffs respond that CONSOL has waived objections to both venue and personal jurisdiction because CONSOL did not include those objections in its first responsive pleading to the original complaint in this matter.  CONSOL replies that plaintiffs have the burden of establishing that personal jurisdiction exists and that venue is properly laid with respect to each new cause of action pled in the SAC, and that plaintiffs have not met this burden.

A defendant must assert lack of personal jurisdiction or improper venue in its first responsive pleading to avoid waiver.  See Fed. R. Civ. P. 12(h)(1)(B).  Although plaintiffs twice amended their complaint, "[a]n amendment to the pleadings permits the responding pleader to assert only such of those [Rule 12] defenses which . . . were not available at the time of his response to the initial pleading."  Rowley v. McMillan, 502

13

F.2d 1326, 1333 (4th Cir. 1974).  Here, the defenses of personal jurisdiction and venue were available to CONSOL at the time of CONSOL's initial responsive pleading, yet CONSOL did not raise these defenses then.[7]  (See ECF No. 14.)

Therefore, because these defenses were waived, venue is proper in this district to claims against CONSOL, and this court has personal jurisdiction over CONSOL.[8]  CONSOL's motion to dismiss the claims against it - claims 1), 3), 5), and 7) as previously listed - is unsuccessful on these grounds.

### B. Subject Matter Jurisdiction over CONSOL for LMRA Claim

CONSOL contends that the court lacks subject matter jurisdiction over it on Count I because it is not an "employer" under LMRA § 301.  CONSOL also argues that the court cannot enforce the Trustees' ROD decision against it because it is neither a signatory to the 2011 NBCWA nor a party to the

---

[7] CONSOL conclusorily states in a footnote that "the unavailability exception applies in the instant case," (ECF No. 90), but gives no argument why it applies.  CONSOL elsewhere states in that same brief that it had closed its West Virginia office in 2016, prior to the filing of this action.  (See id.) Thus, it seems clear that the defenses of personal jurisdiction and venue were available to CONSOL at the time it made its first responsive pleading on January 20, 2017.

[8] This court previously found the same, ruling that "Defendant CONSOL Energy has waived its personal jurisdiction and venue defenses."  Int'l Union, UMWA v. Consol Energy, Inc., 243 F. Supp. 3d 755, 760 (S.D.W. Va. 2017).

Employer Plan's agreement to ROD arbitration.[9]  Plaintiffs
respond that this court, in its previous opinion granting the
preliminary injunction, has already found that subject matter
jurisdiction exists over CONSOL for purposes of LMRA § 301:
"[a]s far as § 301 of the LMRA is concerned . . . the court may
exercise subject matter jurisdiction."  Int'l Union, UMWA v.
Consol Energy, Inc., 243 F. Supp. 3d 755, 762 (S.D.W. Va. 2017).
Likewise, plaintiffs also argue this court has previously held
that CONSOL "is signatory to a collective bargaining agreement
at issue in this matter."  Id.  CONSOL replies that subject
matter jurisdiction does not exist merely because CONSOL is
deemed to be an agent of the Subsidiaries; CONSOL's acts as
agent may bind the Subsidiaries, but the agent's acts do not
bind the agent.[10]  Additionally, CONSOL argues that no language
in the 2011 NBCWA or the Employer Plan authorizes that a non-
signatory may be bound to these agreements, and such a ruling

---

[9] CONSOL includes an affidavit by Kurt Salvatori, Chief
Administrative officer of CONSOL, to bolster their claims that
CONSOL is not an "employer" and that the court should not
enforce the ROD decision against CONSOL.  (See ECF No. 79, Ex.
B.)

[10] CONSOL also renews its argument that the Subsidiaries are not,
as plaintiffs allege, mere "shell subsidiaries" of CONSOL.

binding a non-signatory such as CONSOL would be contrary to agency principles and arbitration enforcement law.

Like it has already done once previously when it granted plaintiffs' motion to file the SAC, see Int'l Union, UMWA v. CONSOL Energy, Inc., 2018 WL 2328028, at *4 (S.D.W. Va. May 21, 2018), the court upholds its prior ruling on this issue and finds that there is subject matter jurisdiction over CONSOL on the LMRA claim.  The court restates its earlier ruling in relevant part here:

> Defendant CONSOL Energy is the corporate parent. Defendant CONSOL Energy claims that it is "a non signatory to the expired 2011 NBCWA," and as such "has never agreed to arbitrate disputes under that Agreement."  Doc. No. 42.

> The court finds that, in fact and deed, *Defendant CONSOL Energy is the agent of Defendant subsidiaries, none of which have employees or other personnel to make any significant operational or administrative decisions or exercise control over the Employer Plan independent of Defendant CONSOL Energy.*  It was Defendant CONSOL Energy, the court already has observed, that held meetings throughout this judicial district and the State of West Virginia soliciting retired miners' enrollment in its HRA scheme.  *As such, the court concludes that Defendant CONSOL Energy is the real party in interest* and is subject to the court's power to issue an injunction. . . .

> Despite Defendant CONSOL Energy's assertions in its Motion to Dismiss, see Doc. Nos. 13—14, that this court lacks jurisdiction over this case "because Defendant [CONSOL Energy] is not (and was never)

signatory to a labor agreement with the Plaintiff," *CONSOL Energy is signatory to a collective bargaining agreement at issue in this matter.* This is evidenced by CONSOL Energy's July 1, 2011 agreement to adopt the 2011 NBCWA Employer Plan, executed by Nicholas DeIuliis, who was then a top executive of CONSOL Energy. <u>See</u> Doc. No. 8. *Defendant CONSOL Energy, and not its individual subsidiaries, administers the Employer Plan and benefits at issue in this matter.* Notably, CONSOL Energy, not any of its individual subsidiaries, has undertaken the conduct and has, to that end, even transmitted the salient correspondence (invariably on "CONSOL Energy, Inc." letterhead). <u>See id.</u>

As far as § 301 of the LMRA is concerned, this dispute arises "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." Accordingly, the court may exercise subject matter jurisdiction.

<u>Int'l Union</u>, 243 F. Supp. 3d at 762 (emphasis added).

The court finds no basis to change its earlier ruling.[11]

CONSOL is an "employer" under LMRA § 301, and is effectively a

---

[11] The court has reviewed Kurt R. Salvatori's affidavit, (ECF No. 79-1), and has found in it no grounds to upend its earlier rulings. While the letters this court earlier reviewed do refer to "CONSOL" and not simply "CONSOL Energy Inc.", there is no evidence that these letters intended to refer to Consolidated Coal Company and not CONSOL Energy, Inc., and thus no evidence that the court clearly misinterpreted the letters. As CONSOL itself points out, "CONSOL" was used as shorthand reference for Consol Energy Inc. as well as Consolidated Coal, and sometimes used to refer to them jointly. (See ECF No. 80.) This underscores that the court was correct to interpret the letters and CONSOL's involvement as it did.

signatory to the Employer Plan and its agreement to ROD arbitration.[12]  Thus, there is subject matter jurisdiction over CONSOL for plaintiffs' LMRA enforcement claim.

### C. First-to-File

Defendants argue that Count I should be dismissed because it was not first-filed.  Instead, they contend that the Second WDPa Suit was first-filed.  Plaintiffs respond that this issue has been addressed by the WDPa, which ruled contrary to the Subsidiaries' argument.  Plaintiffs further state that any first-filed argument is moot following the WDPa's decision to transfer the Second WDPa Suit to this court.

Simply put, defendants are mistaken in arguing that the Second WDPa Suit was first-filed.  This action was filed on

---

[12] Case law further supports this court's previous ruling.  See, e.g., Vance v. N.L.R.B., 71 F.3d 486, 490 (4th Cir. 1995) (finding a single employer where interrelation of operations, common ownership, or centralized control of labor relations are present); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320–21 (4th Cir. 1988) ("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement."); Crest Tankers, Inc. v. Nat'l Mar. Union of Am., 796 F.2d 234, 237 (8th Cir. 1986) ("an employer which has not signed a labor contract may be so closely tied to a signatory employer as to bind them both to the agreement"); see also U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc., 860 F.3d 131, 141 (4th Cir. 2017) ("Consol 'control[led] the subsidiary's employment decisions' sufficient to make it a[n] employer").

18

December 23, 2016, while the Second WDPa Suit was filed on
October 31, 2017.  The fact that plaintiffs filed the SAC on May
23, 2018 does not change the fact that this action in this court
was first-filed.  The WDPa court addressed this very issue and
found similarly:  "the 'first-filed' court is the West Virginia
Court."  Helvetia Coal Co. v. United Mine Workers of Am., Int'l
Union, 2018 WL 3122378, at *6 (W.D. Pa. June 26, 2018).
Moreover, this opinion by the WDPa was issued after plaintiffs
filed the SAC, yet this made no difference to that court;
instead, it explained that "[t]he Union Plaintiffs first sought
an injunction in West Virginia in order to allow the arbitration
process to proceed.  Eventually, the arbitration decision was
issued in favor of the Union Plaintiffs and it can be no
surprise to the parties that the Union Plaintiffs seek to [amend
their complaint to] enforce the arbitration decision in the West
Virginia Court."  Id.

Therefore, this court finds no grounds to dismiss Count I
on the basis of the first-filed rule.

### D. Service of Process upon the Subsidiaries

In its first motion to dismiss, the Subsidiaries argue that
plaintiffs' service of process upon them was improper.  The
Subsidiaries state that they were served process in Pennsylvania
and not in West Virginia, as required by Rule 4 of the Federal

Rules of Civil Procedure, and that the LMRA does not provide for extraterritorial service of process.  Plaintiffs respond that the extraterritorial service of process was proper because ERISA § 502(e)(2) authorizes nationwide service of process.  The Subsidiaries did not substantively counter this point in their reply.

The court finds in favor of the plaintiffs, and rules that extraterritorial service of process upon the Subsidiaries was proper due to ERISA's nationwide service of process provision. ERISA § 502(e)(2) provides that "process may be served in any other district where a defendant resides or may be found."  29 U.S.C. § 1132(e)(2).  The Subsidiaries may be found in Pennsylvania, and thus service upon them of the entire complaint in Pennsylvania was proper.

### E. Retiree-Plaintiffs' Standing to Bring LMRA Claim

Defendants argue that while the UMWA has standing to bring the LMRA § 301 claim in Count I, the Retiree-Plaintiffs do not have standing to bring such a claim.  Plaintiffs respond that because the UMWA does have standing, an admitted lack of standing by the Retiree-Plaintiffs has no effect on this court's ability to enforce the ROD decision against defendants through the UMWA's claim.  Defendants do not appear to contest this conclusion.

20

The court finds that the UMWA has standing to bring the LMRA claim because it is a labor organization party to the 2011 NBCWA.  See Trevathan v. Newport News Shipbuilding & Dry Dock Co., 944 F.2d 902 (4th Cir. 1991) ("Section 301(a) of the LMRA authorizes employers and labor organizations, parties to a collective bargaining agreement, to bring an action in federal district court to enforce or remedy provisions of the agreement.").  However, the individual Retiree-Plaintiffs do not possess standing under LMRA § 301, as "federal courts have held that an individual employee cannot appeal an arbitrator's award under Section 301(a)."  Id.  Therefore, the court hereby **DISMISSES** the Retiree-Plaintiffs' LMRA claims, previously listed as claims 3) and 4), for lack of statutory standing.

### F. Plaintiffs' Standing to Bring ERISA Claim

#### i. UMWA associational standing

Defendants assert – inverse to their argument regarding the LMRA claim in Count I – that while the Retiree-Plaintiffs have standing to bring the ERISA claim in Count II, the UMWA does not have standing to bring the ERISA claim.  Plaintiffs counter that the UMWA possesses associational because the UMWA is seeking to vindicate the rights of its union members and is not seeking anything for itself, and because several courts have allowed unions to sue under ERISA through associational standing.

21

However, defendants reply that the UMWA would fail to meet the elements of associational standing because the individual plaintiffs here are not pled to be members of the UMWA but are retirees, and because many district courts in the Fourth Circuit have rejected standing by a union to pursue claims under ERISA § 502(a)(3).

The Supreme Court has established that an association has standing to bring suit on behalf of its members when:  (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  But circuits are split on applying associational standing for ERISA § 502(a)(3) claims brought by unions.  *Compare* S. Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois, 326 F.3d 919, 922 (7th Cir. 2003) (allowing associational standing), *with* Local 6-0682 Int'l Union of Paper v. Nat'l Indus. Grp. Pension Plan, 342 F.3d 606, 609 n.1 (6th Cir. 2003) (rejecting associational standing) and New Jersey State AFL-CIO v. New Jersey, 747 F.2d 891, 892 (3rd Cir. 1984) (same).

The Fourth Circuit has not directly addressed the issue of whether a union possesses associational standing for ERISA § 502(a) claims.  However, at least one district court in the Fourth Circuit has addressed the issue and explicitly rejected standing by a union to pursue claims under § 502(a) of ERISA. See United Food & Commercial Workers Local 204 v. Harris-Teeter Super Markets, Inc., 716 F. Supp. 1551, 1561 (W.D.N.C. 1989) ("This Court holds that the Union lacks standing as a plaintiff under [ERISA § 502(a)(3)] because it is neither a participant nor a beneficiary of the Plan.").  Though the decision in United Food is not binding on this court, the court agrees with its sister district court's ruling and finds that unions do not possess associational standing to bring § 502(a)(3) claims. This conclusion is rooted in the fact that when ERISA explicitly authorized certain parties to bring § 502(a) claims, it did not include unions in that list.

ERISA § 502(a) specifies the types of claims that may properly be pursued under ERISA, as well as the parties having standing to assert those claims.  The only parties entitled to pursue an ERISA claim under § 502(a)(3) are "participants," "beneficiaries," and "fiduciaries."  See 29 U.S.C. § 1132(a)(3). The Supreme Court has expressed multiple times that ERISA is a

23

"carefully crafted and detailed enforcement scheme," Mertens v.
Hewitt Assocs., 508 U.S. 248, 254 (1993), that ERISA § 502 is
"comprehensive" and "carefully integrated," Massachusetts Mutual
Life Ins. Co. v. Russell, 473 U.S. 134 (1985), and that "ERISA
carefully enumerates the parties entitled to seek relief under §
502." Franchise Tax Bd. v. Construction Laborers Vacation
Trust, 463 U.S. 1, 27 (1983).  This court thus places great
weight on the fact that unions were not included in §
502(a)(3)'s list of parties entitled to bring suit.  See also
Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209
(2002) ("[W]e have noted that ERISA's carefully crafted and
detailed enforcement scheme provides strong evidence that
Congress did not intend to authorize other remedies that it
simply forgot to incorporate expressly." (internal quotations
and citations omitted)).

Therefore, this court finds that by confining the right to
sue under § 502(a)(3) to plan participants, beneficiaries, and
fiduciaries, Congress intended to prevent unions from suing on
behalf of participants except when the unions are acting in a
fiduciary capacity.  Here, the UMWA is not acting in a fiduciary
capacity, and has not attempted to claim that it is suing in a
fiduciary capacity.  Instead, it is acting in a solely
representational capacity.  See Forys v. United Food &

Commercial Workers Int'l Union, 829 F.2d 603, 607 (7th Cir. 1987) (a union is not a fiduciary when it "performs solely the task of presenting the claims of its individual members"). Thus, the UMWA does not have standing to bring the ERISA § 502(a)(3) claim in Count II.  See Licensed Div. Dist. No. 1 MEBA/NMU, AFL-CIO v. Defries, 943 F.2d 474, 478 (4th Cir. 1991) ("[A] union does not have standing under § 1132 . . . [to sue] on behalf of its members since in such a representative role it is not acting as a fiduciary.").

As such, the UMWA does not have standing to bring its Count II ERISA claim, and the court hereby **DISMISSES** the UMWA's ERISA claim – claims 5) and 6) as previously listed.

### ii. Retiree-Plaintiffs' standing

The Subsidiaries argue that not only does the UMWA not have standing to sue under ERISA, but the Retiree-Plaintiffs also lack Article III standing because they have not suffered a legally sufficient injury.  The Subsidiaries contend that nowhere in the SAC is an alleged injury pled.  Even if the SAC had included the allegations of collective anxiety, fear, or apprehension from receipt of the Retiree Letters – as has been argued by plaintiffs in briefs – the Subsidiaries argue that emotional distress from misleading communications falls far beneath Article III's floor of personalized, concrete injury-in-

fact, and that abstract allegations of possible future injury are insufficient to satisfy Article III standing requirements. Moreover, they argue that the fact that plaintiffs have alleged a statutory injury under ERISA is insufficient to remedy the lack of constitutionally required standing.

Plaintiffs respond that the Retiree-Plaintiffs possess Article III standing for four reasons: "first, the violation of a statutory right or requirement can, in and of itself, satisfy the injury-in-fact requirement of Article III; second, Defendants ignore the specific considerations to establish standing in an ERISA case; third, this case is unlike the district court cases relied on by Defendants; and fourth, Plaintiffs have adequately asserted injury-in-fact to establish constitutional standing."  (ECF No. 115.)

First, plaintiffs argue that harm exists from the invasion of the statutorily created ERISA protection; an Article III injury can exist "solely" by virtue of "statutes creating legal rights, the invasion of which creates standing."  (Id. (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 373 (1982)).) Second, many courts, including the Second and Ninth Circuits, have concluded that it is not necessary to plead any injury other than the injury of receiving misleading information from their ERISA plan fiduciary.  Third, plaintiffs contend that the

26

Fourth Circuit in Holland did not reject the possibility that
statutory standing could give rise to a legally cognizable
injury if that injury was asserted by the beneficiaries directly
impacted by misrepresentations, as is the case here.
Additionally, plaintiffs note that but for the court's
injunction in this case, defendants would have unilaterally
implemented the plan changes and caused irreparable harm to
plaintiffs.  And fourth, as previously argued in prior briefs,
the misrepresentations by CONSOL caused the harm of anxiety and
distress in the retirees; intangible injuries can be considered
concrete injuries under Article III standing doctrine.  Further,
plaintiffs argue that to allow a plan fiduciary to communicate
misrepresentations so long as it does not actually change the
plan would be contrary to ERISA's express statutory purpose of
protecting the interests of participants and beneficiaries by
providing appropriate remedies and access to federal courts.
Lastly, plaintiffs request that, should the court find that
injury was not sufficiently pled in the SAC, they be given leave
to file a Third Amended Complaint, which would provide specific
examples of harm incurred by the Retiree-Plaintiffs resulting
from the misinformation they received.

    The Subsidiaries reply that Fourth Circuit law in David v.
Alphin, 704 F.3d 327 (4th Cir. 2013), is inapposite to

27

plaintiffs' arguments.  They point to the Fourth Circuit's
language in David, which stated that "[a]ppellants failed to
plead that they personally have sustained a concrete and
particularized injury.  Nor in our view, does trust law, or the
deprivation of a statutory right under ERISA, give rise to an
Article III injury-in-fact."  Id. at 343.  The Subsidiaries
argue that this court's issuing of a preliminary injunction in
this case does not excuse plaintiffs from satisfying Article III
standing for each count in the SAC, and that no policy
considerations support finding standing for an injury divorced
from harm, particularly when the declaratory remedy sought is
largely fulfilled by the legal remedy provided in the LMRA Count
I claim.  Moreover, they argue that if a plan participant had
Article III standing to bring a fiduciary breach action every
time they received a communication the participant thought was
erroneous, the courts would be flooded with cases.

## 1. Statutory standing

The court finds that the Retiree-Plaintiffs clearly possess
statutory standing.  They have pled a breach of fiduciary duty
in violation of ERISA.  See Griggs v. E.I. DuPont de Nemours &
Co., 237 F.3d 371, 380 (4th Cir. 2001) ("ERISA administrators
have a fiduciary obligation 'not to misinform employees through
material misrepresentations and incomplete, inconsistent or

contradictory disclosures.'" (quoting <u>Harte v. Bethlehem Steel
Corp.</u>, 214 F.3d 446, 452 (3d Cir. 2000)).  This statutory
standing is also conceded in the Subsidiaries' second motion to
dismiss:  "the Court properly assumes that the six individual
plaintiffs are among the class of individuals with statutory
authorization to sue their ERISA Plan over an alleged ERISA
violation, <u>see</u> 29 U.S.C. § 1132(a), and that breach of fiduciary
duty is a statutory injury established by ERISA."  (ECF No.
112.)

However, the Subsidiaries are correct that the Fourth
Circuit has made clear that ERISA statutory standing and Article
III constitutional standing are "distinct requirements."  <u>See,
e.g.</u>, <u>David</u>, 704 F.3d at 338 (collecting ERISA cases).  Thus,
this court has the power to entertain the Retiree-Plaintiffs'
ERISA claim "only where [plaintiffs] have both statutory and
constitutional standing."  <u>Id.</u> (emphasis in original).

2. Article III standing

*a. Previous injunction*

To begin, this court's earlier granting of a preliminary
injunction in plaintiffs' favor has no bearing on whether the
Retiree-Plaintiffs possess Article III standing for their ERISA
claim.  The need to satisfy the three elements of Article III

standing "persists throughout the life of the lawsuit."  Wittman
v. Personhuballah, 136 S. Ct. 1732, 1736 (2016).

### b. Article III standing requirements

Regarding Article III standing itself, to establish injury-
in-fact, a plaintiff must show that he or she suffered "an
invasion of a legally protected interest" that created an injury
which is "concrete and particularized" and "actual or imminent,
not conjectural or hypothetical."  Lujan v. Defenders of
Wildlife, 504 U.S. 555, 559-60 (1992).  For an injury to be
"particularized," it "must affect the plaintiff in a personal
and individual way."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540,
1548 (2016) (quoting Lujan, 504 U.S. at 560 n.1).  And for an
injury to be "concrete," it must be de facto and actually exist,
rather than be merely abstract.  Id.

### c. Statutory injury itself insufficient

Plaintiffs claim that a statutory injury may itself be
sufficient to create Article III standing, arguing that injury
can exist "solely" by virtue of "statutes creating legal rights,
the invasion of which creates standing."  Havens Realty Corp. v.
Coleman, 455 U.S. 363, 373 (1982).  They refer to the Supreme
Court's statements in Spokeo that "Congress may "elevat[e] to
the status of legally cognizable injuries concrete, de facto
injuries that were previously inadequate in law."  Spokeo, 136

30

S. Ct. at 1549 (quoting Lujan, 504 U.S. at 578, 580).
Plaintiffs also refer to a decision from the Ninth Circuit which
concluded that it is not necessary to plead any injury other
than the bare injury of receiving misleading information from
their ERISA plan fiduciary.  See Shaver v. Operating Eng'rs
Local 428 Pension Trust Fund, 332 F.3d 1198, 1202-03 (9th Cir.
2003) (holding that failure to allege a loss was not fatal to
the beneficiaries' claim because "[t]he question of whether a
fiduciary violated his fiduciary duty is independent from the
question of loss" and that "[r]equiring a showing of loss in
such a case would be to say that the fiduciaries are free to
ignore their duties so long as they do no tangible harm").

However, plaintiffs' arguments misconstrue the Supreme
Court's ruling in Spokeo, and do not reflect the law of the
Fourth Circuit.  Spokeo itself states that "Article III standing
requires a concrete injury even in the context of a statutory
violation.  For that reason, [a plaintiff] could not, for
example, allege a bare procedural violation, divorced from any
concrete harm, and satisfy the injury-in-fact requirement of
Article III."  136 S. Ct. at 1549 (2016).  Moreover, Fourth
Circuit law confirms that neither trust law nor the "deprivation
of a statutory right under ERISA . . . give rise to an Article
III injury-in-fact."  David, 704 F.3d at 343.  Instead,

31

plaintiffs must show concrete harm in addition to the ERISA statutory violation.  See Baehr v. Creig Northrop Team, P.C., 953 F.3d 244, 256 (4th Cir. 2020) (holding no Article III standing where there is "a statutory violation divorced from any real world effect"); Holland v. Consol Energy, Inc., 781 F. App'x 209, 214 (4th Cir. 2019) ("Without any concrete harm or risk of real harm, the plaintiffs have alleged only a bare statutory violation that can't satisfy Article III requirements.").

### d. Emotional distress insufficient

The SAC contains one statement that may show concrete harm caused by the fiduciary breach, as it states that following retirees' receipt of the Retiree Letters sent by CONSOL, "UMWA staff subsequently fielded a great number of telephone calls from anxious retirees concerned about their health benefits." (ECF No. 78, ¶ 26.)  Plaintiffs argued in their briefs that the retirees' anxiety and emotional distress caused by CONSOL's alleged misrepresentations constitutes concrete harm.  Indeed, this court notes that in some cases, "a plaintiff's emotional distress, anger, and frustration can distinguish cognizable injuries from bare procedural violations.  Suarez v. Camden Prop. Tr., 2019 WL 3423427, at *3 (E.D.N.C. July 29, 2019).

However, there are three faults with plaintiffs' argument. First, the SAC gives no indication that any of the six Retiree-Plaintiffs suffered anxiety or emotional distress as a result of CONSOL's letters.  The specific plaintiffs themselves must have suffered the alleged injuries, and evidence of this is absent here.[13]  Second, injury must be particularized and not merely abstract; generalized anxiety is not sufficiently distinct to serve as injury-in-fact.  And third, emotional distress is not the type of harm that satisfies Article III injury requirements for ERISA 502(a)(3) claims.  This follows from the Supreme Court's explanation that "[i]n determining whether an intangible harm constitutes injury in fact . . . the judgment of Congress play[s] [an] important role."  Spokeo, 136 S. Ct. at 1549.

In enacting ERISA, Congress's expressed concern was to protect "the interests of participants in employee benefit plans."  29 U.S.C. § 1001(b).  The Supreme Court stated that a beneficiary's "interest" in the plan is his "nonforfeitable right only to" the "defined level of benefits" established under

---

[13] Plaintiffs requested that, if the court were to find a lack of concrete harm, plaintiffs be granted leave to file a Third Amended Complaint in order to provide specific harms incurred by plaintiffs due to defendants' alleged breach of their fiduciary duty.  The court declines to grant leave to do so, as this filing would be futile in light of the third (and possibly the second) reason why emotional distress cannot satisfy Article III's concrete harm requirement.

the plan.  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 440
(1999).  The Fifth Circuit has explained that ERISA's statutory
design and purpose, combined with the Supreme Court's ruling on
Article II standing in Spokeo, means that "the mere allegation
of fiduciary misconduct in violation of ERISA, divorced from any
allegation of risk to defined-benefit-plan participants' actual
benefits, [cannot] constitute de facto injury sufficient to
establish constitutional standing."  Lee v. Verizon Commc'ns,
Inc., 837 F.3d 523, 530 (5th Cir. 2016).  There must be an
actual or imminent injury to a plaintiffs' benefits to satisfy
Article III standing.  Thus, "ERISA does not authorize suits for
. . . emotional distress resulting from a plan's failure to
honor its obligations."  Evans v. Akers, 534 F.3d 65, 73 (1st
Cir. 2008) (citing Reinking v. Philadelphia Am. Life Ins. Co.,
910 F.2d 1210, 1219–20 (4th Cir. 1990)); Brotherston v. Putnam
Investments, LLC, 2017 WL 2634361, at *5 (D. Mass. June 19,
2017), aff'd in part, vacated in part, remanded, 907 F.3d 17
(1st Cir. 2018) ("ERISA requires plaintiffs to prove losses to
the plan for any breach of fiduciary duty claim" (emphasis
added)).

    The Fourth Circuit ruled in a similar vein in its decision
in Beck v. McDonald, 848 F.3d 262 (4th Cir. 2017), relating to
claims under the Privacy Act.  There, the Fourth Circuit

rejected the plaintiff's claims that being "emotional[ly] upset" and fearful were sufficient "adverse effects" to confer Article III standing under the Privacy Act statutory scheme.  Id. at 272.  The Privacy Act required a plaintiff to prove actual damages from a violation of the act, and not mere statutory injury, because of the Act's statutory construction and purpose. See id.  Additionally, the Fourth Circuit in Dreher explained that a plaintiff suffers a concrete injury when he suffers a statutory violation, "*and* he 'suffers, by [that violation] the type of harm *Congress sought to prevent*.'"  Dreher v. Experian Info. Sols., Inc., 856 F.3d 337, 345 (4th Cir. 2017)  (quoting Friends of Animals v. Jewell, 828 F.3d 989, 992 (D.C. Cir. 2016)).  The court continued that "it would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice" to create a concrete injury for Article III standing purposes. Id. at 346.

The type of harm Congress sought to prevent through allowing suits pursuant to ERISA § 502(a)(3) was injury to a plaintiffs' plan benefits.  Hughes Aircraft Co., 525 U.S. at 440.  Here, no such injury is alleged as the basis for plaintiffs' ERISA claim; instead, the injury alleged revolves solely around the falsity of CONSOL's communications.  (See ECF

No. 78, ¶¶ 53-55.)  Moreover, such an injury to plan benefits is
not even possible given this court's previous injunctive order
preventing defendants from changing the benefits due under the
terms of the Employer Plan.  Therefore, plaintiffs are "left
with a statutory violation divorced from any real world effect,
[which] does not confer standing." Id. at 345–46.[14]

---

[14] The court also notes the similarity of this case to that in
Holland v. Consol Energy, Inc., 781 F. App'x 209 (4th Cir.
2019).  That case, like here, revolved around letters CONSOL
sent to plan beneficiaries informing them of upcoming changes to
their health coverage.  Id. at 211.  These letters, like here,
led to "numerous calls from beneficiaries who are concerned
about these changes to their coverage" and caused the 1992 Plan
and UMWA Trustees to "expended resources monitoring the
situation."  Id.  And in that case, like here, plaintiffs sought
(in part) a declaratory judgment that CONSOL had violated a
statutory right, giving them a statutory injury.  Id. at 211-12.
The Fourth Circuit found that the Holland plaintiffs did not
possess Article II standing; their alleged risk of future harm
caused by the changes was too speculative to create Article II
standing, and the statutory injury was itself insufficient
absent additional concrete injury or concrete risk of injury.
Id. at 212-14.  Nowhere did the court mention that the
beneficiaries' emotional distress or the time answering those
calls served as a valid, concrete injury-in-fact.

The court does note there is one important difference
between this case and Holland:  in Holland, no individual
beneficiaries were plaintiffs in that action – only the Trustees
of the 1992 plan were.  See id. at 210.  The district court
referenced this, stating that "[i]t may be that the
beneficiaries themselves have suffered a concrete and
particularized injury that is not hypothetical or speculative,
but no beneficiaries are named Plaintiffs in this matter."
Holland v. CONSOL Energy Inc., 2018 WL 4323928, at *5 (S.D.W.
Va. Sept. 10, 2018) (Johnston, C.J.), aff'd, 781 F. App'x 209
(4th Cir. 2019).

This ruling does not let ERISA plan fiduciaries off the hook for misrepresentations.  Rather, it simply ensures that any alleged intangible injury is tethered to the statutory scheme and capable of producing real world effect.  Further, this ruling prevents a potential flood of cases being filed from plaintiffs alleging emotional distress from a fiduciary's misrepresentation when there is no actual or imminent harm to their plan benefits.

Therefore, the court finds that the Retiree-Plaintiffs do not possess standing to bring their Count II ERISA claim, and the court hereby **DISMISSES** the Retiree-Plaintiffs' ERISA claim - claims 7) and 8) as previously listed.

Neither the UMWA nor the Retiree-Plaintiffs possess standing to bring the ERISA claim in Count II.  Because there is no ERISA claim left by either plaintiff against either defendant, the court hereby **DISMISSES** Count II of plaintiffs' Second Amended Complaint against all defendants - claims 5), 6), 7), and 8) as previously listed.

---

This distinction prevents Holland from being controlling on-point precedent against plaintiffs, but it does nothing to help plaintiffs, as the court still directly states that individual beneficiaries would need to show concrete and particularized injury.  Holland does not state that the evidence of their calls or distress would or would not be sufficient to meet that requirement.

### G. Failure to State a Valid ERISA § 502(a)(3) Claim

The court has found that no plaintiff has standing to bring its ERISA claim for making material misrepresentations in breach of their fiduciary duties, and thus finds no need to address whether plaintiffs' ERISA claim against CONSOL fails to state a valid claim under ERISA § 502(a)(3).  However, the court will briefly explain why, in the alternative that even if plaintiffs were to have standing to bring their ERISA claim, the ERISA claim against the Subsidiaries must be dismissed because it is facially lacking.

"In order to establish a claim for breach of fiduciary duty based on alleged misrepresentations, a plaintiff must show:  1) that a defendant was a fiduciary of the ERISA plan, 2) that a defendant breached its fiduciary responsibilities under the plan, and 3) that the participant is in need of injunctive or other appropriate equitable relief to remedy the violation or enforce the plan."  Adams v. Brink's Co., 261 F. App'x 583, 589-90 (4th Cir. 2008) (citing Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 379-80 (4th Cir. 2001) and Blair v. Young Phillips Corp., 235 F. Supp. 2d 465, 470 (M.D.N.C. 2002)).

38

Here, the second element is totally lacking as to the Subsidiaries.[15]  The SAC refers to five pieces of correspondence sent to plan beneficiaries – the Retiree Letters - as the basis for their ERISA fiduciary breach claim.  (See ECF No. 78, ¶¶ 26, 39, 40 and 41.)  In its ERISA claim in Count II of the SAC, plaintiffs allege that CONSOL "for itself and its subsidiaries" sent the Retiree Letters.  (Id. ¶ 53.)  However, plaintiffs have previously and repeatedly stated that CONSOL – and not the Subsidiaries – was the sole entity responsible for sending these communications.  (See, e.g., ECF No. 16, ¶ 4 ("it is CONSOL Energy and not its subsidiaries that engaged in the conduct at issue in this case"); ECF No. 25, ¶¶ 3-4 ("CONSOL Energy has undertaken the conduct and transmitted the correspondence at issue").)  Moreover, this court previously ruled on these exact lines, relying on the plaintiffs' aforementioned statements laying responsibility on CONSOL.  See Int'l Union, UMWA v. Consol Energy, Inc., 243 F. Supp. 3d 755, 762 (S.D.W. Va. 2017) ("Notably, CONSOL Energy, and not its individual Subsidiaries . . . transmitted the salient correspondence (invariably on 'CONSOL Energy, Inc.' letterhead)"); Int'l Union, UMWA v. CONSOL

---

[15] As this second element is lacking, the court need not address defendants' contention that plaintiffs' ERISA claim also cannot satisfy the third element.

Energy, Inc., 2018 WL 2328028, at *5 (S.D.W. Va. May 21, 2018) ("CONSOL's Subsidiaries did not engage in any action regarding the alleged misleading communications at issue.")

The Subsidiaries are correct that plaintiffs' prior statements (and this court's finding) that CONSOL transmitted the Retiree Letters is an admission which judicially estops plaintiffs from making a valid claim that the Subsidiaries have breached their fiduciary duty by sending out the Retiree Letters.  See Lucas v. Burnley, 879 F.2d 1240, 1242 (4th Cir. 1989) (holding that a party is bound by the admissions of his pleadings).  Plaintiffs have alleged no action taken by the Subsidiaries that constituted a breach of fiduciary duty under ERISA, and thus this serves as an alternative ground upon which the court hereby **DISMISSES** the ERISA claims against the Subsidiaries – claims 6) and 8), as previously listed.

## H. Personal Jurisdiction over the Subsidiaries

### i. Personal jurisdiction for ERISA claim

Personal jurisdiction exists over the Subsidiaries as to the ERISA claim due to ERISA's nationwide service of process provision.  The parties do not dispute this conclusion.  This is not relevant for the court's adjudication of the ERISA claim itself, given that neither the UMWA or the Retiree-Plaintiffs have standing to bring their ERISA claim and the SAC fails to

40

state an ERISA claim against the Subsidiaries.  However, the
court states this conclusion plainly because of its potential
effect on whether personal jurisdiction exists over the
Subsidiaries as to the LMRA claim via the theory of pendent
personal jurisdiction.

   *ii.  Personal Jurisdiction for LMRA claim*

   In its memorandum opinion and order granting the
preliminary injunction, this court found that this court lacks
personal jurisdiction over the Subsidiaries.  See Int'l Union,
UMWA v. Consol Energy, Inc., 243 F. Supp. 3d 755, 761-62 (S.D.W.
Va. 2017).  This court previously found that "[t]here is neither
general nor specific jurisdiction over these Defendants since
they are not situated in West Virginia and they have committed
no substantial activities here that would open them to being
sued here. They have not purposefully availed themselves of the
benefits here." Id.  Plaintiffs have offered no new facts that
would change this analysis and create personal jurisdiction over
the Subsidiaries.  Therefore, the court today reaffirms its
earlier finding, and concludes that a traditional due process
minimum contacts analysis shows that there is no personal
jurisdiction over the Subsidiaries on the LMRA claim.

   However, plaintiffs argue that personal jurisdiction exists
over the Subsidiaries as to the LMRA claim either:  1) through

41

the exercise of pendent personal jurisdiction; 2) through the
Subsidiaries' presence before this court in the transferred
Second WDPa Suit; or 3) through the fact that personal
jurisdiction exists over the Subsidiaries' agent and parent
corporation – CONSOL - via the alter ego theory to personal
jurisdiction.  The Subsidiaries reply that pendent personal
jurisdiction is unwarranted in this case because it would lead
to "abandoning time-honored, minimum contacts jurisdictional . .
. constraints long applied to LMRA jurisprudence."[16]  (ECF No.
102.)  Additionally, the Subsidiaries contend that there are
clear facial deficiencies within the ERISA claim against them;
allowing this faulty ERISA claim to be the source from which
personal jurisdiction exists against them for the LMRA claim is
not the type of situation where pendent personal jurisdiction
should be exercised.

### 1. The Second WDPa Suit

The court rejects the contention that the Subsidiaries are
subject to personal jurisdiction in this case because their

---

[16] More specifically, the Subsidiaries argue that unlike other
cases where pendent personal jurisdiction has been exercised –
such as federal antitrust, bankruptcy, class action,
interpleader, patent, racketeering, or securities fraud suits –
the procedural and jurisdictional constraints on LMRA claims are
based off of a congressionally-created balance between labor and
management, and thus the court should not use its discretion to
exercise pendent personal jurisdiction and upset this balance.

Second WDPa Suit was transferred to this district and is pending
before this court.  The Subsidiaries have been present in that
action, filing a notice of appearance and a motion to transfer
back to the WDPa.  See Second WDPa Suit, ECF Nos. 39 and 46.
However, in their first pleadings in the Second WDPa Suit
following transfer to this court, the Subsidiaries clearly
express that they dispute jurisdiction in this court in this
suit, and their motion to transfer is pled in the alternative to
their motions to dismiss in this case.  Thus, the court finds
that the Subsidiaries have not waived their objection to
personal jurisdiction or consented to the court's personal
jurisdiction over them in this matter.  Moreover, it would be
inequitable for a defendant to be subjected to personal
jurisdiction merely because another case of theirs was
transferred to the instant forum in spite of their opposition.[17]

---

[17] The court also notes that when the WDPa transferred the Second
WDPa Suit to this district, it did so thinking that its transfer
would not be a jurisdictional event.  See Helvetia Coal Co. v.
United Mine Workers of Am., Int'l Union, 2018 WL 3122378, at *3
(W.D. Pa. June 26, 2018) ("[P]ermitting the Union Plaintiffs to
file a second amended complaint in the West Virginia Action . .
. allowed the Union Plaintiffs to assert a claim to confirm the
Trustees' arbitration determination and a claim under ERISA,
thus allowing the addition of CONSOL's four subsidiary companies
as defendants.").

2. Pendent personal jurisdiction

The court also declines to exercise its discretion to apply the doctrine of pendent personal jurisdiction.  Under the doctrine of pendent personal jurisdiction, "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180–81 (9th Cir. 2004).  The Circuit Courts of Appeals are split on whether courts can and should exercise pendent personal jurisdiction: the Second, Seventh, Ninth, Tenth, and D.C. Circuits have authorized courts to exercise pendent personal jurisdiction, see, e.g., Action Embroidery Corp., 368 F.3d at 1180–81; United States v. Botefuhr, 309 F.3d 1263, 1272–75 (10th Cir. 2002); Robinson Eng'g Co., Ltd. Pension Plan Trust v. George, 223 F.3d 445, 449–50 (7th Cir. 2000); IUE AFL–CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056–57 (2d Cir. 1993); Oetiker v. Werke, 556 F.2d 1, 5 (D.C. Cir. 1977), while the First, Third, and Fifth Circuits have ruled against exercises of pendent personal jurisdiction.  See, e.g., Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274–75 (5th Cir. 2006); Remick v. Manfredy,

44

238 F.3d 248, 255 (3d Cir. 2001); Phillips Exeter Acad. v.
Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999).

        All courts that have authorized pendent personal
jurisdiction have left its exercise within the discretion of the
district court, and it may only be applied to grant personal
jurisdiction over a claim that shares a common nucleus of
operative facts with a claim in the same suit over which the
court does have personal jurisdiction.  See Action Embroidery
Corp., 368 F.3d at 1180–81 ("Like our sister circuits, we hold
that the actual exercise of personal pendent jurisdiction in a
particular case is within the discretion of the district
court.").  Here, there are no doubts that the two claims are in
the same suit and share a common nucleus of operative fact.

        The Fourth Circuit has authorized pendent personal
jurisdiction over state claims joined with a federal claim that
does convey personal jurisdiction.  See ESAB Grp., Inc. v.
Centricut, Inc., 126 F.3d 617, 628 (4th Cir. 1997).  In so
holding, the Fourth Circuit reasoned that

        When a federal statute authorizes a federal district
        court to exercise personal jurisdiction over a
        defendant beyond the borders of the district and the
        defendant is effectively brought before the court, we
        can find little reason not to authorize the court to
        adjudicate a state claim properly within the court's
        subject matter jurisdiction so long as the facts of
        the federal and state claims arise from a common

nucleus of operative fact. The defendant will have to
adjudicate the facts of the federal claim, and it
could impose only a minimal burden to require the
defendant to provide a defense on the factually-
related state claim.

Id. However, the Fourth Circuit has not applied pendent
personal jurisdiction to create jurisdiction over another
federal claim, as opposed to a state claim – as plaintiffs are
asking the court to do here.

Several district courts in the Fourth Circuit have
criticized pendent personal jurisdiction, particularly in these
instances where both claims are federal claims. See, e.g.,
Edwards v. Schwartz, 378 F. Supp. 3d 468, 491 (W.D. Va. 2019);
Gatekeeper Inc. v. Stratech Sys., 718 F. Supp. 2d 664, 667–68
(E.D. Va. 2010) (critiquing pendent jurisdiction on the grounds
that out-of-state defendants "could not reasonably anticipate
being haled into court on claims unrelated to [their] forum
state contacts, and thus [doing so] would violate their due
process rights"). However, the court finds that the Fourth
Circuit's rational in ESAB applies equally to exercising pendent
personal jurisdiction over a fellow federal claim. The
defendant is already before the court on a matter with a common
nucleus of operative fact, and the minimal burden is equivalent
whether the pendent claim is a federal or a state claim.

"[J]udicial economy and convenience of the parties is best facilitated by a consideration of all legal theories arising from a single set of operative facts. . . . Once that set of facts and defendants are legitimately before the court . . . little would be gained by not requiring a defendant to defend against a certain type of theory superimposed upon those facts." ESAB, 126 F.3d at 628 (quoting Sohns v. Dahl, 392 F. Supp. 1208, 1218 (W.D. Va. 1975)).

Thus, the court concludes it is within its right to use its discretion to exercise pendent personal jurisdiction over the Subsidiaries for the LMRA claim, as there is personal jurisdiction over them from the ERISA claim.  However, the court declines to do so for the following reasons.

In deciding whether to exercise its discretion to exercise pendent personal jurisdiction, courts should consider the interests of judicial economy, convenience, and whether the exercise of jurisdiction on the defendant is reasonable and fair to litigants.  See Pet Specialties, LLC, v. NavisionTech, Inc., 2019 WL 4773623, at *8 (M.D.N.C. Sept. 30, 2019) (citing Action Embroidery Corp., 368 F.3d at 1180–81); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial

economy, convenience and fairness to litigants; if these are not
present a federal court should hesitate to exercise
jurisdiction."). In this case, although it may be convenient
and in the interests of judicial economy to exercise pendent
personal jurisdiction if the ERISA claim remained, it would be
remarkably unfair to the Subsidiaries given the facial
weaknesses of the ERISA claim against the Subsidiaries, which is
the claim serving as the hinge of the exercise.

The court has ruled herein that neither the UMWA nor the
Retiree-Plaintiffs have standing to bring their ERISA claim.
Moreover, the court has also discussed how plaintiffs have not
alleged any actions taken by the Subsidiaries which could
constitute a breach of fiduciary duty. Instead, the ERISA claim
relies upon misrepresentations in the Retiree-Letters sent out
by CONSOL, on CONSOL letterhead. Plaintiffs have pled no
involvement by the Subsidiaries in these misrepresentations.
Thus, while the standing issue is admittedly a closer question,
it is exceedingly clear that the ERISA cause of action against
the Subsidiaries must be dismissed.

The court has not found a case where pendent personal
jurisdiction is exercised while the court simultaneously
dismisses the claim which it possesses jurisdiction over. There
are several likely reasons why. To do so would be an unadvised

extension of the doctrine of pendent personal jurisdiction.  The dismissal of the jurisdiction-creating claim also destroys the interests of convenience and judicial economy, as there would no longer be any reason why the case should persist before the court.  Moreover, if the court were to decide to exercise pendent personal jurisdiction in this case despite the obvious deficiencies in the claim serving as the source of jurisdiction, this would serve as an incentive to all plaintiffs who may lack personal jurisdiction to add meritless claims where federal personal jurisdiction is present to try to use them as a jurisdictional loophole.

Additionally, exercising pendent personal jurisdiction in this context would be manifestly unfair to the Subsidiaries. This court has previously established that it lacks personal jurisdiction over the Subsidiaries, as they do not have minimum contacts to West Virginia.  While ERISA's nationwide service of process is in some senses an end-around of personal jurisdiction limitations, it is a Congressionally created and sanctioned one. But to hale the Subsidiaries into court through a claim that the court has simultaneously dismissed creates significant due process concerns.  Therefore, the court declines to exercise pendent personal jurisdiction over the Subsidiaries on the LMRA claim against them.

### 3. Agency and alter ego theory

The court finds that it cannot exert personal jurisdiction on the Subsidiaries merely because it has personal jurisdiction over CONSOL, the Subsidiaries' agent.[18]  Prior to Daimler, this might have been the case.  However, in Daimler,  the Supreme Court completely repudiated agency-based jurisdiction when it would subject a defendant to general personal jurisdiction.  See Daimler AG v. Bauman, 571 U.S. 117, 136 (2014) ("[A]gency theory thus appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the 'sprawling view of general jurisdiction' we rejected in Goodyear.").  CONSOL is subject to general personal jurisdiction in this case because they waived their defense to personal jurisdiction.  See supra.  Moreover, CONSOL would not be subject to specific personal jurisdiction in this case, as the relevant actions in this case took place outside the forum:  the ROD arbitration proceeding occurred in Washington, D.C., and the Retiree Letters were sent from CONSOL's headquarters in Pennsylvania.  No specific acts taken by CONSOL can be

---

[18] CONSOL is also the parent of the Subsidiaries.  But a parent-subsidiary relationship does not by itself support jurisdiction. Saudi v. Northrop Grumman Corp., 427 F.3d 271, 276 (4th Cir. 2005).

attributed to the Subsidiaries that would legitimize the exertion of specific personal jurisdiction over them.  Thus, attempting to assert personal jurisdiction via agency jurisdiction theory runs into the due process problems prohibited by Daimler.

The court also cannot exert personal jurisdiction over the Subsidiaries via the alter ego theory.  Alter ego theory states that a court "may exercise personal jurisdiction vicariously over an individual if the court has jurisdiction over the individual's alter ego company."  Sky Cable, LLC v. DIRECTV, Inc., 886 F.3d 375, 391–92 (4th Cir. 2018).  Here the court has jurisdiction over CONSOL because CONSOL waived its defense to personal jurisdiction.  Additionally, "[a] court may exercise jurisdiction over an entity if its alter ego . . . 'waived any objections to lack of service of process.'"  Id. at 392 (quoting Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224 (2d Cir. 2009)).

However, the court does not go so far as to pierce the corporate veil between CONSOL and the Subsidiaries.  Such an act should only be done in extreme cases where the interests of justice require it, such as in matters of fraud or where other significant equitable considerations are present.  See Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir. 1981) (explaining that

51

under federal common law, the veil may be pierced only in the interests of public convenience, fairness and equity); see also Pauley Petroleum Inc. v. Cont'l Oil Co., 239 A.2d 629, 633 (Del. 1968).  Here, the court has relied on the record, testimony at the preliminary injunction hearing, and agency theory to find that CONSOL is a signatory to the Employer Plan, its ROD grievance procedure, and is thus subject to LMRA § 301.  See supra; Int'l Union, UMWA v. Consol Energy, Inc., 243 F. Supp. 3d 755, 758-59, 762 (S.D.W. Va. 2017); see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (agency is a valid theory for binding non-signatories to arbitration agreements).  The court does not find that the factors are present to fully pierce the corporate veil, as there is no alleged fraud, there is no lack of corporate formalities or abandonment of the corporate structure, among others.  See id. at 778; Brookline, 667 F.2d at 221; (see also ECF No. 79, Ex. 1 ¶ 13.)  Therefore, the court does not find the conditions present to pierce the corporate veil, and the alter ego theory of personal jurisdiction is unavailable.

There is no proper method for this court to exert personal jurisdiction over the Subsidiaries on the LMRA claim.  Thus, both plaintiffs' Count I claim against the Subsidiaries - claims

52

2) and 4) as previously listed - is hereby **DISMISSED** for lack of personal jurisdiction.

### I. Venue for Claims Against the Subsidiaries

The court has thus far found that personal jurisdiction does not exist over the Subsidiaries as to the Count I LMRA claim, and neither plaintiff has standing to bring their Count II ERISA claim.  To that extent, no claim remains against the Subsidiaries in this case by any plaintiff.  Therefore, the court finds no need to address the Subsidiaries' arguments that venue is improper as to the LMRA and ERISA claims.

### J. Exhaustion of Administrative Remedies for ERISA Claim

The court has also thus far found that neither plaintiff has standing to bring the Count II ERISA claim.  To that extent, no ERISA claim remains against either CONSOL or the Subsidiaries.  Therefore, the court finds no need to address the defendants' arguments that the Retiree-Plaintiffs' ERISA claim must be dismissed for failure to exhaust administrative remedies.

### K. Plaintiffs' motion to consolidate

Plaintiffs argue that this case and the Second WDPa Suit should be consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure because they involve the same parties and near identical issues, there is no risk of prejudice or

confusion through consolidation, and it is in the interests of judicial economy to merge the two cases.  Defendants oppose consolidation, arguing that there is no threat of inconsistent rulings because both cases are assigned to the same judge, and there is no prejudice or loss of judicial economy by keeping cases separate pending rulings on motions to dismiss. Defendants also claim that if the court were to rule on the motions to dismiss prior to ruling on the motion to consolidate, either a ruling in plaintiffs' or defendants' favor would moot the need for consolidation.

"[P]roper application of Rule 42(a) requires the district court to determine whether the specific risks of prejudice and possible confusion from consolidation were overborne by the risk of inconsistent adjudications . . . the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives." Campbell v. Boston Sci. Corp., 882 F.3d 70, 74 (4th Cir. 2018). Consolidation is a matter of the court's discretion.  See Fed. R. Civ. P. 42(a); A/S J. Ludwig Mowinckles Rederi v. Tidewater Construction Corp., 559 F.2d 928, 933 (4th Cir. 1977) ("District courts have broad discretion . . . to consolidate causes pending

in the same district.").  A court may also order the
consolidation of cases despite the opposition of the parties.
See Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 293 (1892).
When exercising this discretion, district courts should "weigh
the risk of prejudice and possible confusion versus the
possibility of inconsistent adjudication of common factual and
legal issues, the burden on the parties, witnesses, and judicial
resources by multiple lawsuits, the length of time required to
try multiple suits versus a single suit, and the relative
expense required for multiple suits versus a single suit."  In
re Cree, Inc., Sec. Litig., 219 F.R.D. 369, 371 (M.D.N.C. 2003)
(citing Arnold v. Eastern Air Lines, Inc., 681 F.2d 186, 193
(4th Cir. 1982)).

Here, the court finds that the two cases involve common
questions of law and fact,[19] and judicial economy significantly

---

[19] In the Second WDPa Suit, all of the Subsidiaries' claims made
in their Amended Complaint are predicated on the exact same
factual basis as this case, and all claims similarly relate to
validity and enforcement of the Trustees' ROD decision.  See
Second WDPa Suit, 1:18-cv-01095 (S.D.W. Va. filed Oct. 31,
2017), ECF No. 25.  The Subsidiaries make the following five
claims in their Amended Complaint:  1) The Trustees lack the
authority under the expired 2011 NBCWA to decide ROD No. 11-
0143; 2) ROD No. 11-0143 must be vacated because the Trustees
did not have the authority to decide their own jurisdiction or
to resolve the 2017 HRA controversy; 3) Enrollment of
Plaintiffs' age 65 Medicare eligible retirees and age 65
dependents in a Health Reimbursement Account (HRA) does not
violate Plaintiffs' obligation to provide health benefits to

favors consolidation.  Due to the rulings in this opinion
dismissing all claims against the Subsidiaries, the two cases
now involve different parties:  this case is a suit by the UMWA
against CONSOL, while the other case involves a suit by the
Subsidiaries against the UMWA.  However, the Subsidiaries should
have no concern that consolidation would simply be an end-around
to rope the Subsidiaries back into the instant case.  As the
Supreme Court has explained, "consolidation is permitted as a
matter of convenience and economy in administration, but does
not merge the suits into a single cause, or change the rights of
the parties, or make those who are parties in one suit parties
in another.  Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496-97
(1933).

The court does not find that its ruling this day moots
plaintiffs' motion for consolidation; the LMRA claim by the UMWA
against CONSOL has survived the motions to dismiss, and thus
this case remains pending before this court.  It is in the
interests of judicial economy to consolidate the two cases at
this point now, prior to the beginning of time-consuming and

---

their retirees after the expiration of the 2011 NBCWA; 4) ROD
No. 11-0143 did not satisfy elements of fundamental fairness
because the Trustees are not neutral or impartial; and 5) The
requirements of the National Labor Relations Act govern the
parties' retiree health benefits negotiations.  Id.

costly discovery.  Moreover, the court's decision to transfer the instant case creates an additional reason for consolidation. If this case were transferred but the parallel Second WDPa Suit not consolidated and transferred, then the cases would run the risk of resulting in inconsistent rulings because they would be before different judges in different districts.

For these reasons, the court hereby **GRANTS** plaintiffs' motion to consolidate this case with the Second WDPa Suit, 1:18-cv-01095 (S.D.W. Va. filed Oct. 31, 2017).  This case, Int'l Union, United Mine Workers of Am. v. Consol Energy, Inc., No. 1:16-cv-12506 (S.D.W. Va. filed Dec. 23, 2016), shall be the lead case.

### L. The Subsidiaries' motion to transfer

The Subsidiaries argue that it is in the interests of justice to transfer the case, as other venues – such as the District of Columbia or the WDPa – are much more appropriate forums and would not be subject to the jurisdictional and procedural issues that have bogged this case down. Additionally, they argue that plaintiffs' initial choice of forum is entitled to little or no weight.  Plaintiffs respond opposing the motion to transfer, arguing that:  their choice of forum is entitled to substantial weight; defendants have not explained why the current forum is inconvenient to parties and

57

witnesses; judicial economy does not favor transfer when the
WDPa has already twice transferred cases to this court; and the
personal jurisdiction issues do not merit transfer because the
court has personal jurisdiction over the Subsidiaries.

The Subsidiaries reply that the court should focus on Count
I when analyzing the transfer factors.  (See ECF No. 118.)  They
then argue that analyzing these factors weigh in favor of
transfer:  defendants and even the UMWA are inconvenienced by
this forum, and thus transfer would not shift inconvenience from
one party to the other; the interests of justice weigh in favor
of transfer because it would facilitate discovery, trial, and
resolve the considerable personal jurisdiction problems in this
case; and the D.C. Circuit is a better forum for enforcement of
the LMRA claim, as the ROD arbitration proceeding occurred in
Washington, D.C. and is the forum where the parties agreed to
arbitrate.

The federal transfer of venue statute provides, "[f]or the
convenience of parties and witnesses, in the interest of
justice, a district court may transfer any civil action to any
other district . . . where it might have been brought."  28
U.S.C. § 1404(a).  It is designed to "protect litigants,
witnesses and the public against unnecessary inconvenience and
expense."  Continental Grain & Co. v. Barge FBL, 364 U.S. 19, 27

58

(1960).  The proponent of transfer has the burden of persuasion, and transfer will be denied if it merely shifts the inconvenience from the defendant to the plaintiff.  See Branch Banking & Tr. Co. v. ServisFirst Bank, 2019 WL 7165980, at *15 (S.D.W. Va. Dec. 20, 2019).

Transfer motions are committed to a trial court's discretion and evaluated according to flexible and "individualized, case-by-case considerations of convenience and fairness."  Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988). The Fourth Circuit has established four factors that a district court should consider in deciding motions to transfer under § 1404(a):  "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice."  Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir. 2015).

Weighing the four factors, the court finds that factors (2), (3), and (4) weigh in favor of transfer, and factor (1) is weakened due to this court's dismissal of the Retiree-Plaintiff's claims.  Thus, the court will exercise its discretion to transfer this case to the District of Columbia.

As to factor (1), "[a] plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer

59

is appropriate.'" Id. (quoting Bd. of Trs. v. Sullivant Ave.
Props., LLC, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007)).
However, the one party which was a resident of this district -
the Retiree-Plaintiffs – is no longer a party to the case.
Having lost the plaintiff who was the only resident of this
district, the court finds that the plaintiffs' choice of venue
in this forum is entitled to less weight than in regular
circumstances where the plaintiffs remain unchanged.
Furthermore, "when the operative facts underlying the cause of
action did not occur within the forum chosen by the Plaintiff,
the choice of forum is entitled to less consideration." A.J.
Taft Coal Co. v. Barnhart, 291 F. Supp. 2d 1290, 1310 (N.D. Ala.
2003).  The facts underlying the LMRA claim in Count I occurred
not here in West Virginia, but as part of the ROD proceedings in
Washington, D.C.

Factor (2) weighs in favor of transfer to the District of
Columbia because many of the witnesses reside much closer to
Washington, D.C. than to southern West Virginia.  The UMWA
Health and Retirement Fund is headquartered in Washington, D.C.
and the UMWA has its general headquarters in northern Virginia.
(ECF No. 112, Ex. 1 ¶¶ 5-6.)  It is likely that many of the
relevant Plan officials and Union representatives who processed

60

the ROD[20] reside in or near these areas as well, and may be asked

to testify for post-arbitration discovery as judicial review of

the Trustees' ROD decision commences.  The court need not

discuss, if this case remained in this district, whether or not

these individuals would be outside of this district's subpoena

power.  The close proximity of anticipated witnesses in this

particular ROD enforcement suit itself demonstrates convenience

that favors transfer to the District of Columbia.[21]

Factor (3) also weighs in favor of transfer to the District

of Columbia.  Although the UMWA has offices in the SDWVa, it is

headquartered in northern Virginia.  CONSOL is headquartered in

Pennsylvania, and thus a transfer to the District of Columbia

may only be of marginal increased convenience.  However, neither

party argues that a transfer to the District of Columbia will

inconvenience them, and thus there is no concern here that the

---

[20] The Subsidiaries state that potential witnesses will include
(i) UMWA representatives who communicated with the 1993 Plan
Trustees and their staff concerning the Richard Fink ROD
Complaint, (ii) the 1993 Plan Trustees appointed by the UMWA who
served as arbitrators in the dispute, (iii) the Trustee-
arbitrator unaffiliated with the UMWA, and (iv) UMWA Health and
Retirement Funds staff who prepared and recommended the decision
to the Arbitrators.

[21] Further, plaintiffs have not argued that transfer to D.C.
would create inconveniences.  Instead, they merely argued that
transfer would not be more convenient – an argument this court
disagrees with for the above reasons.

61

transfer merely shifts the inconvenience from the defendant to the plaintiff.  See Branch Banking, 2019 WL 7165980, at *15.  If anything, from a convenience perspective, the transfer benefits the UMWA more than it does CONSOL.

The interests of justice also weigh in favor of transfer to the District of Columbia.  Plaintiffs allege that transfer would not be in the interests of justice because it would delay this proceeding.  The court readily admits that, due to the procedural and jurisdictional complexity in this case, this proceeding has already been significantly delayed.  But the court finds that there would be no additional delay through transfer to the District of Columbia.  In fact, transfer may facilitate the speedy remainder of the proceedings, particularly if plaintiffs attempt to again amend their complaint in some manner to re-join the Subsidiaries.  The court agrees with plaintiffs that it would not be in the interests of justice to transfer this case to the WDPa, which has already transferred parallel cases to this court on two occasions.  See First WDPa Suit; Second WDPa Suit.  However, transfer to the District of Columbia does not have the effect of reversing court judgments in this manner.  Although this court has "expended substantial time and thoughtful consideration to the legal questions surrounding this factual situation," Helvetia Coal Co. et al v.

62

UMWA, 2017 WL 3669415 at *7-8 (W.D. Pa. Aug. 23, 2017), the District of Columbia is a more appropriate and convenient venue to litigate the remaining LMRA § 301 arbitration enforcement claim (and the similar claims made by the Subsidiaries in the consolidated case).  Now is also an appropriate time to transfer, as it is prior to discovery beginning.

It is also in the interests of justice to transfer to the District of Columbia because there are no procedural or jurisdictional impediments with such a transfer.  The District of Columbia would have subject matter jurisdiction and be a proper venue to adjudicate Count I, as it seeks an order confirming the 2017 ROD Arbitration Award which was rendered in Washington, D.C.[22]  (See ECF No. 78, ¶ 3.)   Moreover, the court notes that the District Court for the District of Columbia would have had personal jurisdiction over the Subsidiaries as to the Count I LMRA claim because the Subsidiaries participated in the ROD process in Washington, D.C.

For these reasons, the court in its discretion finds that it is fair, convenient, and altogether in the interests of justice to transfer this case.  The court hereby **GRANTS**

---

[22] Subject matter jurisdiction exists "in the district in which an arbitration was conducted."  Amalgamated Clothing & Textile Workers Union, AFL-CIO, CLC v. Fed'n of Union Representatives, 664 F. Supp. 995, 996 (S.D.W. Va. 1987).

defendants' motion to transfer, and transfers the remaining
Count I LMRA claim in this case - and the now-consolidated
parallel Second WDPa Suit - to the District Court for the
District of Columbia.

### III. <u>Conclusion</u>

The court has ruled on the pending motions.  For the
reasons expressed herein, the only remaining claim in this case
is Claim 1) - the UMWA's Count I LMRA § 301 claim against CONSOL
seeking confirmation of the Trustees' ROD decision.

Claim 1), UMWA's Count I LMRA claim against CONSOL,
survives all challenges made in defendants' motions to dismiss,
and thus remains pending in this case.

Claim 2), UMWA's Count I LMRA claim against the
Subsidiaries, survives defendants' first-to-file challenge and
the Subsidiaries' service of process challenge.  However, the
court does not have personal jurisdiction over the Subsidiaries,
and therefore all claims made in Count I against the
Subsidiaries must be **DISMISSED** for lack of personal
jurisdiction.

Claim 3), Retiree-Plaintiffs' Count I LMRA claim against
CONSOL, survives CONSOL's venue, personal jurisdiction, subject
matter jurisdiction, and first-to-file challenges.  However,

this claim must be **DISMISSED** because the Retiree-Plaintiffs do not have statutory standing to bring an LMRA § 301 claim.

Claim 4), Retiree-Plaintiffs' Count I LMRA claim by the Retiree-Plaintiffs against the Subsidiaries, survives defendants' first-to-file challenge and the Subsidiaries' service of process challenge.  However, this claim must be **DISMISSED** because the Retiree-Plaintiffs do not have statutory standing to bring an LMRA § 301 claim, or, in the alternative, because the court does not have personal jurisdiction over the Subsidiaries as to this claim.

Claim 5), UMWA's Count II ERISA claim against CONSOL, survives CONSOL's motions to dismiss for improper venue and lack of personal jurisdiction.  However, this claim must be **DISMISSED** because the UMWA does not have standing to bring this claim.

Claim 6), UMWA's Count II ERISA claim against the Subsidiaries, survives the Subsidiaries' service of process challenge.  However, this claim must be **DISMISSED** because the UMWA does not have standing to bring this claim, or, in the alternative, because it fails to state a valid claim under ERISA § 502(a)(3).

Claim 7), Retiree-Plaintiffs' Count II ERISA claim against CONSOL, survives CONSOL's venue and personal jurisdiction challenges.  However, this claim must be **DISMISSED** because the

65

Retiree-Plaintiffs lack Article III standing to bring this claim.

And claim 8), Retiree-Plaintiffs' Count II ERISA claim against the Subsidiaries, survives the Subsidiaries' service of process challenge. However, this claim must be **DISMISSED** because the Retiree-Plaintiffs lack Article III standing to bring this claim, or, in the alternative, because it fails to state a valid claim under ERISA § 502(a)(3).

Therefore, for the foregoing reasons, CONSOL's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, the Subsidiaries' first motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, the Subsidiaries' second motion to dismiss Count II is **GRANTED,** plaintiffs' motion to consolidate is **GRANTED,** and the Subsidiaries' motion to transfer Count I is **GRANTED.**

This case, Int'l Union, United Mine Workers of Am. v. Consol Energy, Inc., No. 1:16-cv-12506 (S.D.W. Va. filed Dec. 23, 2016), shall be the lead case among the consolidated cases.

The court transfers the remaining claim pending in this case – and all claims in the now-consolidated parallel Second WDPa Suit, Helvetia Coal Co. v. UMWA, No. 1:18-cv-01095 (S.D.W. Va. filed Oct. 31, 2017) – to the District Court for the District of Columbia.

66

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

IT IS SO ORDERED this 4th day of June, 2020.

Enter:

David A. Faber
Senior United States District Judge